Good morning, Your Honors. Good morning. My name is Jason Goslin, and I represent the plaintiff in this matter, Donna Bush, who brought this action on behalf of herself and her son, Wesley. If I may, I'd like to reserve five minutes of my time for rebuttal. Fine, fine. Perhaps you might want to start by telling us whose expressive conduct is involved here. Is it both Mrs. Bush and her son, or is it just Mrs. Bush? It's actually both. This activity, this all-about-me week activity, really involved two types of expressive conduct. In the first instance, it was Wesley Bush who decided with his mother what he wanted his mother to do when she came into the classroom. The second expressive conduct, of course, is Mrs. Bush's conduct. She was the invited speaker who came into the classroom to participate in this classroom activity. Good. And she was the one who selected the particular verse. Is that correct? She did select the particular verse. Why can't it be said that Mrs. Bush stood in Wesley's shoes? That this was really student speech? I think it can be said that this was Mrs. Bush standing in the shoes of her son, because it was his selection to choose the Bible. This is something that was very important to him and his mother, and he is the one who asked her to come in and share this Bible-reading activity, which is something that they did each and every morning before school. So in that sense, it certainly was his speech. His mother stood in his shoes, but she was the speaker. In terms of your analysis, does it really make any difference whether the expressive conduct was one or the other or both? I don't think it does, because what we're dealing with is a non-public forum. We concede that a school is a non-public forum, and in a non-public forum, the government has the greatest latitude in restricting speech. Our position is that even in a non-public forum, speech restrictions must be viewpoint neutral. Typically, in a school setting, if an assignment asks the student in responding to the assignment to offer his own input, in the typical scenario, the school would have to apply viewpoint neutrality principles to the student's assignment. In a situation like this, where you're actually inviting somebody to come in and speak to a classroom, you have to apply those viewpoint neutrality principles to the invited speaker. I'm having a great deal of difficulty with this case, and I'll tell you one of the reasons why. You are or you're not? I am. Okay. You cite Pecker, and Tinker, and Hazelwood, and Morse, and a whole line of cases. High school students, college students, 5th, 6th, 7th grade students, 3rd grade students. Would not the most appropriate case for us, for our purposes here, be Walls, which is a kindergarten case. This is about kindergartners, 5 and 6 year olds. I absolutely think Walls. And Walls doesn't mention, in so many words, viewpoint discrimination. It doesn't talk about the type of forum. It doesn't talk about the type of scrutiny. It just finds, as very important, the youth of these children, and the importance of what the school has to do. Why don't you talk about Walls? Well, I do talk about Walls. But let me... It's described at two pages of your brief, and mentioned at one other. That's the extent of your discussion on Walls. Well, I'll be happy to spend a lot of time talking about Walls. I'm sure Judge Sirica would like that. He's not an egomaniac. Well, I had to remind myself to be careful, and not to pretend that I know more than the panel about Walls. The reason that we cited those other Supreme Court cases is because I thought it was important to kind of step back, and appreciate what a real forum analysis would require. A forum analysis, when you're dealing with a non-public forum, there still is the requirement of viewpoint neutrality. There's a dispute going on among the circuits that says Hazelwood overruled, or created an exception to the requirement of viewpoint neutrality in a school setting. We disagree with that. We believe the Third Circuit, and Walls is the closest case that goes to dealing with that issue. We believe that Walls supports our reading of Hazelwood. But even before we can talk about Walls, we have to look to the Supreme Court precedent. Why? We've simplified, we, the editorial we, Chief Judge Sirica, has simplified, he's been here a long time, has simplified this whole very difficult, confusing area when dealing with little children. Why do we have to go back and reinvent the wheel? I don't think we have to, and I think Walls supports our position in this case. Let me explain why. The Walls decision never really mentioned this theoretical dispute going on within the circuits about Hazelwood, and whether it overruled, or created an exception for viewpoint neutrality. I thought Walls was a very common sense approach, and one of the relevant factors that the Walls court found was that you have to look at whether the assignment solicited the individual viewpoint or the input from the student. And Walls, I thought, I thought it was a great example where the court said, if you're talking about a show and tell activity, it would be perfectly appropriate for a student to pass around a Christmas ornament, or a dreidel, and to explain why that ornament is significant to that student, because that's what the curriculum was all about. It would not be appropriate if the assignment is to, you know, talk about a great American poet, to come in and talk about the Bible. The district court found in Walls that Daniel Walls, who was four and a half at the time, the time he tried to distribute the pencils, was not able to read and advocate the message on the pencils, much less, I suggest, the candy cane story, which was quite complicated. And I'm not so sure that the little ones who were to receive the pencils and the candy canes would know what they said, either, here. We know Wesley couldn't read. That's a matter of record. I refer you to Appendix 671. I do not know, or cannot believe, frankly, that a child whose expressive activity is as seen on 671 would understand what the House of Aaron is, or Israel is, or the ephemeral concept of salvation. So here we are, speaking and looking at the words of Psalm 118, which purportedly come from Wesley through his mother's mouth. Well, that's not right. And I wonder, would the children who are hearing this have any idea what is being said? I have a five-year-old, and I can tell you, she would not understand that. And that actually makes my point. That makes my point. The point of this was not to teach the children about Psalm 118. That was not at all what this... The point is not to give them something that the reader doesn't know what is being read, and the kids who are being read to have no idea what it's all about. Isn't that the reality here? That is the reality, but that's not the point of the assignment. The point of All About Me was for the child to share something about himself with his classmates. If you want to come in and talk about fly fishing, there are things that students would not know or understand about fly fishing because it's above their level. The point is not to teach the activity that the student enjoys with his parent. The idea is to teach the students that this is something about Wesley and his family and his traditions. Which they can't understand because he doesn't understand because he's reading, as you just said, he can't read. And you said your five-year-old wouldn't understand. The evidence in the case is that Psalm 118 reads at a seventh grade level. These are little children. I understand that, but the reason is it is truly an activity that Donna Bush participates in with her five-year-old son at the time. That is what they do. They are devout Christians. It is a meaningful activity to them. Part of it is the alone time that Wesley had with his mother, and part of it is raising him to be a Christian the way the Bush parents want to do. It's the activity that's being shared. It's not that they're trying to indoctrinate these young students in Psalm 118. That's not at all what's going on here. But then it's not a viewpoint case at all, it seems to me. You're just saying, am I correct, that this is a matter of what's important to Wesley, and it could be about any number of things. It just happens to be the Bible in this particular instance. Well, sure. So religion is not... Put another ten minutes on, please. So I'm not certain, if you aren't trying to have it both ways, that it's viewpoint discrimination because it affects religion, and yet on the other hand, it could be about anything. Wesley could have asked his mother to come in and talk about something else. He could have done that. He asked her to come in and read the Bible because that's what they do. She chose Psalm 118. The restriction was because of religion. The restriction came from the school, and that was where the school engaged in viewpoint discrimination. And I think it's important to note that the district court made a factual finding that the school engaged in viewpoint discrimination. That has not been challenged in this appeal, and I think the court has to accept that there was viewpoint discrimination in this case. The question is whether viewpoint discrimination is permitted in a school setting because there's an exception for schools, or whether the general law that applies to all other non-public forums applies here. And that's why we go back and we talk about Hazelwood, we talk about all the Supreme Courts. We talk about Tinker, and the Armbands, and the college kids, and the pregnancy, and the school, and all that stuff, but we have said in our cases, and it's not unique to this court, that age and maturity are critical factors in the analyses in which we have to engage here. Age and maturity. Did the school say that this was inappropriate because it was over their head? No. That came up afterward, and that's why there was an analysis of Psalm 118 that came out in discovery. But if you look at the depositions in the case, and when we asked... The principal thought it was an establishment clause violation. Yes. That is the reason that they didn't allow it. But the problem with saying, okay, these are small children, we have to allow the school to decide whether or not they're going to allow it or not to allow it, and we can't challenge them, is that that obliterates this notion that students, that even young students, have rights, and they don't drop their rights at the schoolhouse gate. Well, except that Judge Sloviter, writing for the court in Walker-Serrano, said there may well come a point in time where we are dealing with children so young that it can be presumed there are not the protections of the First Amendment. And I think that's where my particular struggle is coming from. And I think if we could have that debate, there's at least one justice on the Supreme Court who believes that students never have First Amendment rights at all. But I don't think that's... Now, who would that be? Justice Thomas. And that was in his Morse concurrence. He says there's no such thing as First Amendment rights for students in schools. That's just, it doesn't exist. And perhaps... I'm not talking all schools, all grades. I'm just talking about the little children. So, I mean, but as I understand your argument, counsel, you're not saying that your client had a right to do this. As I understand your argument, you're saying, if the school decides to open up this Pandora's box, which I know, ironically, was to prevent conflict and learn about diversity, if the school decides to open the Pandora's box, all about me week, can't be all about me unless it involves the most important thing in my life. Correct. That's exactly our position. Mrs. Bush has no general right to come in and talk to Wesley's class. She has no general right to affect the curriculum. Her only right is when the school opens up the forum ever so slightly and makes an invitation to her and other students, the school has to respect the boundaries that the school itself set in opening up this public forum. And the school didn't do that here. There was also evidence in the record that there were other circumstances where the school did allow parents to come in and deal with religious topics, even in Wesley's class of kindergarten students. Let me ask you about that, because this case, along with what Judge Barry said, it seems to be sort of upside down. In the record, it indicates that there's discussion in this kindergarten class about Easter, Hanukkah, Christmas, Passover, but that's not viewed as influencing the children in a proselytizing way. But this psalm that is about as abstruse as I concur completely with Judge Barry, but this psalm is going to proselytize? My sense is this psalm would go in one ear, out the other. They may tune out after the first three words, but when a parent comes in and talks about Christmas or Easter or Passover, isn't that something that might get the children's religious juices flowing, especially when they hear about all the gifts? I think it's a fair point that if the concern was that the effect on the children would be to impose a religious viewpoint, that's a much greater concern when you're talking about religious activities that are on their level, and it's not really a concern here. The record, I mean, there's a lot going on in this school district. There was, for example, a policy that permitted evergreen trees at or around the middle of December, but they had to be called giving trees. They couldn't be called Christmas trees. But the principal said he let everyone call them Christmas trees. Nobody ever was punished, as far as we know, for calling it Christmas tree. The official They're trying so hard to do the right thing. Sometimes it goes too far to the other direction. There's no case that says you have to call them giving trees, but once you use the word Christmas, people are afraid. That's exactly what it is. I don't think there's any bad faith here on the part of the school administrators. I think they were trying to do what they thought was the right thing. They were concerned, and they made a judgment call, and we disagree with the judgment call, but there's a principal at stake here, and it's this principal of viewpoint neutrality, and I don't think we can just say we're dealing with little kids. You've got to give some leeway to the administrators because that's no standard. How is the next school principal to apply the standard? What if we're dealing with a second grader or a third grader? Under your view in this situation, that in a kindergarten, if the school, the teacher and the school, permit a parent or somebody else to come in to participate in a curricular activity, would there be any limits as to what that invited guest could say? There would be, and there would be the limits set by the school. As to content? As to content, but not religious content. Well, the courts have said that when you're talking about religion, that's really, when you're restricting religious activities or religious speech, you're doing a viewpoint restriction as opposed to a content restriction. So religion itself is considered a category of viewpoint as opposed to content. All right, so there would be no limitation, under your view, there would be no limitation on what, on any religious expression for the invited guest. If the assignment called for something that could have a religious response to it, there really wouldn't be a limitation, at least as to content. No, but this was a situation, let's take the facts here, where there was nothing said about what the content would be. I mean, there were examples that were given, the kind of Christmas story, I'm sorry, books that the particular child may have liked or toys and so forth and so on, but of course religion was not mentioned in that at all. So whether or not you say, well, it was implicitly excluded or not, is it your position that any kind of religious speech under these circumstances would have to be permitted? Under these circumstances, yes, but let me explain because there was a serious content parameter set for this case. The content had to relate to Wesley. I think it would be an entirely different case if the plaintiffs could show that this is all, or I'm sorry, if the defendants could show that this is all pretext, Wesley and his mom, they never do this, this was an attempt of Mrs. Bush to come in and proselytize to little kids. If there were any merit, and that actually was part of their defense at one point, if there were merit to that, we'd be talking about a different case, but the content restriction here is that they had to share an activity that was unique to Wesley and his mother, and the testimony is very clear here. This is something that Wesley and his mom did every day, before school, before bed, it's something they still do. The plaintiffs are very sincere here, and her testimony as to why she chose Psalm 118... I'm sorry, I assume that your answer is that there would be no restrictions, that under these circumstances, any parent could come in and recite verses from any of the religious texts that were the foundation of their religion? Yes, absolutely, as long as it stayed within the content parameters set by the school. And I think your friend across the aisle says, well, according to the husband's testimony, you can come in and talk about Satan being good, and Nazism being good, and Communism being good, all of this in the kindergarten class. Well, I mean, that was an argument that was thrown back at me whenever we talked about this. It's not a bad argument. Well, no, it is a bad argument, because I have a hard time imagining an example more disconnected to reality. I mean, if there is really a... Let me try to give you one more connected to reality. Okay. Let's assume the child's an immigrant from a culture that allows plural marriage. Can the kindergartner walk into class and say, here are my 11 mommies, my father's married to 11 women. In my culture, in my religion, this is what we do. And then read a few passages from a holy text that talks about the appropriateness of that. I mean, you know, it is an example probably more connected to reality. Would it be allowed... I wouldn't think so. I mean, we're talking about something that not just... All about me opens up the field, right? But that's also illegal conduct. I mean, there's a lot going on in that example. Well, no. Sure it is. Not if the marriage has occurred overseas in a country that allows that. Well, I mean, if you're talking about a Muslim family, for example, that maybe somebody's come over from a Muslim country and the father does have three or four wives, well, yeah, I think you probably would have to allow that. I mean, again, I have a harder time imagining that really coming up as an actual example, but I think you would. Okay, and obviously Psalm 118 expresses very profound and beautiful thoughts, but there are passages in various religious texts that disparage other religions because they're non-believers. Would those, if they were read and there were in the class students of that particular religion, should that be permitted? I believe that if... I mean, this is where you have to have a fact finder come in and look at what's really going on. If we're talking about a situation where somebody's attempting to proselytize or disparage or do something that really is not sharing an activity of the parent and child. Well, how can you pick and choose what kind of things can be said? What about the passages in Ezekiel Leviticus Deuteronomy about fathers eating their young? Would that be appropriate here in kindergarten? It would be... I mean, would that be appropriate? I mean, it's a little bit like... The Bible says in Ezekiel Leviticus, Deuteronomy, et cetera, et cetera. There's probably so many references there are to fathers eating their young, eating their sons, and even in a couple of passages their daughters. Now, would you say this could be read to a kindergarten class? In the context of an all about me assignment where that's something that was legit, that was something the family actually did, I think that we're either going to have viewpoint neutrality or we're not going to have. We can have a rule that says you have to be viewpoint neutral, or we can have a rule that says the school district can do whatever it wants depending on how the school principal sees it. I don't believe the latter approach is the law. That's why we're arguing that you have to allow this. I mean, I appreciate this. There are some things that I wouldn't want my own children to have to hear from somebody else, but when we're talking... I wouldn't want my own children to learn about my religion in the schools. I don't want them being taught that. All of us can identify with that, but the important thing here is that this is not something that was being indoctrinated to the children. The point here is to say this is something that Wesley and his mom do, and if there's some child that likes to have... That isn't what was happening. Huh? Perhaps that would have been permissible to get up and say, well, what's important to me? Well, I go to church. I don't think anyone would fault that. This was reading from the Bible. What difference does that make? Millions and millions and millions of people read from the Bible. They read those passages to young children who don't yet understand them. That's part of their upbringing. That's what some people do. That's what some people do. Sharing that activity is... Granted, not all young children or most young children are going to appreciate that, but that's why we have a rule of viewpoint neutrality. What you're suggesting here is that there ought not to be a rule that administrators can apply. They instead should use their judgment to decide, okay, I'm going to allow this. I'm not going to allow this. I will allow this, but not this. Maybe in the kindergarten setting, that's all we really need. Well, if we go back to the examples that were cited in the Walls case, I think the principles that really ought to guide here are, did the assignment solicit the input from the student and or the parent, and was the assignment response or was the work performed responsive to that assignment? That's the case we have in front of us, and I think the Could the teacher have read the Bible in this particular kindergarten class? No. All right. No. Good. Any other questions? Good. We'll have you back on rebuttal, Mr. Kosselin. Kosselin, I'm sorry. Mr. Serrini? Good morning, Your Honors. I'm Mark Serrini. I represent the appellees in this case. One quick technical point, if I may, right off the bat. The appellees do respectfully disagree with the trial court's finding about viewpoint discrimination. We did say that in our brief at page 44, footnote 16. Although I, too, do not pretend to be much of a constitutional scholar, I am a Pennsylvania public school district solicitor, and I've been doing that for going on 19 years. And we are here to ask the court to defer to and not second-guess the judgment of the professional educators in this case, based on their decision, their reasonable decision to draw the line where they did, based on their expertise and the Waltz factors of age and context of this classroom assignment. But if Easter and Christmas and Hanukkah and Passover are fair game in kindergarten, why wouldn't this passage be fair game? Your Honor, that comes from the Pennsylvania State Legislature, which the school boards have to follow. The Pennsylvania State Legislature, in response to the Abington School District case, prohibited the introduction and study of even literature, of the Bible and other religious writings, at any grade level. Compulsory for the class. That's correct. No government body, the state, no local school board, has prohibited our district from allowing the study of religious traditions, even starting at the kindergarten level. That's the difference. But apparently it was permitted in this school and perhaps in this class. Yes, it was expressly permitted. It was part of the curriculum. Was that an error? Not allowing the teacher or guest speaker to talk about the traditions of holidays, that was not an error. That was a specific assignment, wasn't it? I mean, we were going to go on a Christmas holiday, Hanukkah holiday, Easter holiday, and I believe it was a specific assignment to talk about the culture of this holiday. That's correct, Your Honor. And what is involved. That's right. As a cultural matter. That's right. As opposed to a religious matter. That's right. That was part of the social studies curriculum that was approved by the school board and consistent with state law. Going back to Judge Hardiman's point, the difference here is the state legislature said you can't introduce or study any religious text or the literature of any religious text at any level. Well, that's something about school speech. I mean, I think we understand that, but there's an important question as to whether this is really school speech or whether this is private speech. I know you've argued that it's school speech. Right. It seems to be cloudy. Well, Your Honor, I think I can help with that. We have to look at the written invitation. It had two components. One was directed to the student. The only mention of favorite was favorite snack. The student was invited to bring in toys and snacks and things like that, and also to make a poster. And as Your Honors are well aware, the district respected the right of Wesley to make a poster. His mother put a depiction of the church on there. The school allowed Wesley to bring in the poster, and the school displayed the poster in the classroom, just like for every other kid, with a depiction of the church, as well the school should, because that's Wesley's personal right. He was invited to do that, just like all the other kids. In fact, the school allowed him to present to our class the significance of the poster, including the depiction of the church. They contained the language on there, something like, I love to go to the house of the Lord, or I like to go to church. The school allowed that, as it should. But it also invited mom to come in and read a story. Isn't that what really opened up a lot of opportunity for parents to come in and do what they wanted to do? Well, it did. The second component, you're right, Your Honor, did invite the parent to come in and share a talent, a small craft, a short game, or a story with the class. There was no connection between favorite book and story. The focus was on the parent at that point. So the parents invited in as a guest speaker. Mrs. Bush very rightly stated and admitted that she understood there were limitations on that invitation. This is a She didn't want to go to law school. She didn't go to law school. She wrote up an invitation that even Mrs. Bush recognizes contains implied limitations. Just as Chief Judge Sirica said, it has to contain implied limitations. Does that mean any time a teacher brings in a guest speaker, the guest speaker is free to talk about whatever he or she chooses, to of course the limitations. Particularly in this setting, in front of kindergarten kids, in a mandatory exercise, captive audience, with a teacher standing right there while the parent is reading from a book that the state says can't be introduced at that level. Mom apparently took steps to make a more non-denominational prayer or something that did not mention Jesus Christ. That's in the record as well. Yeah, and Your Honor, that And the teacher and the principal, as I understand it, made a call that no, you just can't do this because it's an establishment clause violation. Your Honor, he did say that, but he also said it's illegal. There are two different reasons he gave. It's illegal, plus it would be an establishment clause violation. And illegal harks back to what I just said about what the state legislature But it's only illegal if it's school speech, though. Well, I believe that in this context, and considering the age of the children, any reasonable observer would perceive it as school-sponsored speech, given that the teacher is standing right there. The parent walks up to the teacher, asks for permission. The teacher goes out to speak to the principal. If the principal had allowed it, kindergarteners, I believe, would have perceived that to be illegal. The children had no way of knowing, though, because there's nothing in the record that would indicate that Mrs. Bush had been denied the right to read from the Bible. That's correct, Your Honor. Yes, the children had no way of knowing that. Wesley was not put in a difficult position. He was not punished. The district respected his personal rights through the poster exercise, but drew the appropriate line based on age, which is a the circumstances or the context. But didn't we say in Walls, though, albeit in Dicta, that show-and-tell activity would not be school-sponsored? Well, I think that was one factor, Your Honor, whether that participation was invited. In this case, this is like a show-and-tell, but it really is a guest speaker coming in and that guest speaker is operating under the teacher's rules. So it's not a show-and-tell. Isn't that a stretch, though? I mean, guest speaker, you know, the teacher might ask a parent who's a doctor to come in and talk about the hospital and might invite a lawyer and she can come in and talk about what it means to go to court. I mean, that's different than All About Me Week, isn't it? You have your own week. Each student has their own rule of law here. It's All About Me except religion? No, Your Honor. That's not the rule of law. The rule of law arises out of the facts of this particular case, and that's why I urge the Court to look at that written invitation. That is the basis on which Mrs. Bush came into the classroom. She didn't come into the classroom to tell the class all about Wesley. That happened to be part of the curriculum. But she was invited to come in to share a talent, a short game, a small craft, or a story with the class. She was not invited to come in... Any story's okay. Any story's okay except the biblical story. No. No, Your Honor. Going back to Waltz, there has to be age and context. Restrictions can arise out of age and context. Mrs. Bush... But if you can read about witches, why can't you read a biblical passage? Why are the witches okay in Psalm 118? The notion about witches, Your Honor, I think was perhaps taken by somebody and stretched a little bit. What happened here is the teacher offered Mrs. Bush a book. Halloween, this was Halloween season. She proceeded to be about witches. Why is Halloween okay but not the Bible? Well, because the legislature hasn't prohibited the introduction and study of Halloween books in our schools. They did prohibit the reading of Bibles and other religious texts. So you're emphasizing more the state law prohibition on introducing a sacred text rather than the notion that this would have been an establishment clause violation. Well, as a school district solicitor, my focus is on the former, Your Honor, but I want to do justice to our constitutional scholars who have joined us as friends of the poor. And the thrust of that case is the school district was bending over backwards to try to avoid an establishment clause problem. I mean, isn't that really what this case is all about? According to the principal, that was... Assuming anybody could understand what was being said. Yes, Your Honor. According to the principal, that was one of his two reasons. Right there at the heen of the moment, he said it's illegal, which harks back to the Pennsylvania School Code, and it's an establishment clause violation. I believe it's both, but my focus is... Maybe it would be, maybe it wouldn't be, but what seems to be operating here is that you had men and women of goodwill trying to do their best in a difficult situation. In the heen of the moment, Your Honor, yes. In the heen of the moment. Yes. I agree with that. And it had to be an ad hoc decision. Had to be. It came up just before she was to read. Yes, that's correct. And Your Honor, if I may add, there are a couple, again, from my role as District Solicitor, I see a couple other harms here the district avoided. One immediate harm, education is the search for the truth. I think we all agree. And Mrs. Bush, inadvertently, if she had proceeded with what she planned, would have put those kindergarten kids in a position of asking questions, or perhaps asking questions, and getting answers that don't represent the whole truth. She says that she would not have done that. She just would have left. Well, Your Honor, she did say that she would have responded that this is ancient poetry, and then she would try to scoot out. So she would have gotten in ancient poetry. I have a three-and-a-half-year-old, I think he learned from his grandfather, the challenge authority. He probably would have asked, what do you mean, salvation? And if Mrs. Bush had responded that's ancient poetry. I would bet the ranch that this reading would have taken approximately seven-and-a-half seconds, and there would not have been one question. Because, as Judge Vardaman suggested, these kids would have not had an idea what was going on. It may very well, Your Honor. That's speculation. It's not on the record. The principal could not guarantee that. No question. But I agree with you. But what about the proselytizing aspect? Wouldn't you agree with me that if I wanted to talk to kindergarteners by going in and talking about Christmas and showing them a bevy of gifts that the typical American child hopes or perhaps receives at Christmas, wouldn't that be a much more effective way to convert people to Christianity than reading something like this? Your Honor, I think it all depends on what one's personal beliefs are. We learned somewhat about Mrs. Bush's personal beliefs, which we all respect. She believes that salvation means coming to Christ. And she also recognized that that psalm may have some significance in that regard. There may be many effective ways of proselytizing. And really, her intent, I think, under the case law is really not relevant in that regard. Do you agree with the district court in that regard? Subjective intent is not the issue here. Yes, Your Honor. Reasonable observer. Yes, reasonable observer. I guess that's my question. Wouldn't a reasonable observer say that talking about Christmas is skating closer to or crossing the Establishment Clause line rather than reading something that was written 100 years before the birth of Christ? I don't think so, Your Honor. I mean, excuse me, a thousand years. I think that Christmas has secular traditions. I think a lot of holidays have secular traditions, and that's what the curriculum allowed to be taught. Who is the reasonable observer here? Who would be the reasonable observer? A five- or six-year-old? I think so, Your Honor, given that no other parents were in that classroom other than an adult teacher and an adult guest speaker. This is not a situation where parents are high school kids take a knee before a football game. I think we have only five- or six-year-olds in that classroom, plus the teacher, plus the adult guest speaker. So I think the reasonable observer would have to be the children, the kids. What about the parents of the other students? Do they get factored into this at all? I think so, Your Honor. One of the things we did is protect the rights of all the students in that class. These parents did not have any opportunity to opt their kids out of this exercise, let alone the entire course. It's a mandatory course. No other parent, by definition, knew this was coming, had any chance to take their kid out. So, yeah, the parents and the rest of the kids' rights were also protected by what the school district, how the school district drew the line based on the age of the kids and the context of this classroom exercise. I must say the title of this classroom exercise is quite amazing. I keep trying to teach my family to try not to be narcissistic, and you've got this thing all about me. Right, right. I think it was a bad play on words, and I'll pass on that suggestion. Oh, no, no. Thank you very much. Hold on a second. Would you like some additional time? No, thank you, Your Honors. I appreciate your time. Any other questions here? Thank you. Thank you very much, Mr. Serrini. Mr. Goslin. Thank you. I'm going to try to be very quick with one discrete point. I think what we're talking about really here is what kind of rule are we going to have, and the choices are we can have a rule of viewpoint neutrality, which I think is what the law requires, or we can have a rule that admittedly would be much easier to administer from the perspective of school administrators, and that rule would be that the administrators can do what they think is right when a particular circumstance arises. I agree that that's easier to administer, but I don't believe that's necessarily constitutional. One of the things that Mr. Serrini mentioned I think is worth exploring a little bit. He pointed out that one of Wesley's activities was he made a poster, and it said, I love to go to the house of the Lord, and that was something that was posted up on a wall, and he's making the point that the school was not trying to shut him down in his religion at every turn. They were trying to use their judgment to do it when they thought it was right and when it was not right. The other case, which actually we haven't talked about yet today, but the other Third Circuit case where this issue of viewpoint neutrality in an elementary school setting came up was the Oliva case, and the reason that came up was because a student had a poster that also had religious images on it, and that poster was removed from the public display and put to the side. I point that out only because it points up the fact that some school administrators, and it really depends on the individual, some school administrators are going to say, okay, this is acceptable, but this isn't. Other administrators are going to have a much higher tolerance for religious expression, and the rule should not be just whatever the particular administrator in a particular school decides on that particular day. Those with high tolerance will get sued for establishment clause violence. Perhaps. Can you make a distinction between a sacred text and an expression of religious support? Well, you can, but I think, again, you have to go back to what the assignment itself calls for. It's hard for me on the spot to come up with a hypothetical, but if we're talking about assignment where responding with a sacred text is clearly not responsive, that would not be protected activity. I frankly like the example used in Walz. If we're talking American poets, you don't start talking about the Bible. If we're talking about math, you don't start talking about your religious conversion. I don't think it's all that difficult to discern. It just so happens in this particular case, the response was within the scope of the assignment. It wasn't really a favored story, and then Psalm 118, which was really not a story. Well, the invitation referenced a story. What was the invitation? Well, there was an invitation. There's testimony in the record that prior to coming in, Mrs. Bush met with the teacher and asked her what sort of things should I be doing, and she said, really, anything that relates to Wesley. It could be this or that. It could be his favorite story, if you want. Granted, I think you have to look at the invitation reasonably. Mrs. Riley was not a lawyer. As I was looking at it, I'm thinking she created a list, and it's presumed that there are other things that could be done that are not on the list. We're not talking about using statutory interpretation for this invitation. I think if you look at it reasonably, it's pretty clear, and you look at it in the context of the assignment, the point here was for Mrs. Bush to share something about Wesley. I think, respectfully, what people are having trouble with is that they see this, and they can't imagine that somebody would actually sit down and read the Bible the way Mrs. Bush does to her five-year-old son, but she really does. I don't see that as a problem at all at home. Speaking only for myself, I don't think we're... But that's not the case. That's not what we're talking about. If it's something they do at home, in the context of this assignment, it's acceptable in the school under these circumstances. That's the point. If it's something that's really done at home, and the purpose is to share something that's done at home, it's okay in the context of this assignment. Thank you. Thank you, Mr. Gosselin. We thank both counsel for a very helpful argument. We will take the matter under advisement.